No. 67,413

In the Matter of JOHN E. WILKINSON, *Respondent.*

(834 P.2d 1356)

Opinion filed July 10, 1992.

*Stanton A. Hazlett,* deputy disciplinary administrator, argued the cause, and *Bruce E. Miller,* disciplinary administrator, was with him on the formal complaint and brief for the petitioner.

*Eugene T. Hackler,* of Hackler, Londerholm, Hinkle, Corder, Martin & Hackler, Chtd., of Olathe, argued the cause and was on the briefs for respondent.

*Per Curiam:* In 1987 this court indefinitely suspended John E. Wilkinson from practicing law in Kansas. *In re Wilkinson,* 242 Kan. 133, 145, 744 P.2d 1214 (1987). That suspension remains in effect. At issue in this case is whether Wilkinson violated the suspension order by practicing law, contrary to Supreme Court Rule 218(c) (1991 Kan. Ct. R. Annot. 163) and whether he failed to cooperate in the investigation of this case, contrary to Supreme Court Rule 207 (1991 Kan. Ct. R. Annot. 149).

The hearing panel of the Board for Discipline of Attorneys found Wilkinson had engaged in the unauthorized practice of law and had failed to cooperate in the investigation of the case. The panel recommended Wilkinson be disbarred.

The unauthorized practice of law allegation arises out of a contract for the sale of a business owned by David Hupp and sold to Earl Rice. Hupp and Rice had negotiated the sale, and Hupp had presented a written proposal to Rice. Rice told Hupp that he needed someone who was knowledgeable about documents and that he would have a friend, who used to be an attorney, look at the contract. Wilkinson is accused of representing Rice.

Although the facts are in dispute, it is not necessary to set them out in detail. The important facts are that, after Wilkinson was suspended from the practice of law, he moved his office equipment and law books to the second floor of a friend's warehouse. A law school classmate, Ray Pierson, started practicing law out of the same warehouse. Pierson hired Wilkinson as his law clerk.

Earl Rice testified that he knew Wilkinson could not practice law and that he hired Ray Pierson as his lawyer.

Wilkinson's position is that he acted as a law clerk to Pierson and that everything he did was at Pierson's direction and under Pierson's control. Pierson was unavailable as a witness because his health has deteriorated to the point he is incapacitated. At all times material to this case, Ray Pierson was admitted to the practice of law in Kansas and was in good standing.

In its decision, the panel stated, "There is no legal authority to support the proposition that a law clerk or suspended attorney may practice law under the supervision of an attorney." This, however, is not Wilkinson's argument. Wilkinson maintains he was not practicing law—he was only doing work that an attorney in good standing authorized him, as a law clerk, to perform. The initial inquiry, then, is whether a suspended attorney may be employed as a law clerk.

Both case law and the Model Rules of Professional Conduct (MRPC) sanction an attorney delegating tasks to lay persons. In *State v. Barrett*, 207 Kan. 178, 184, 483 P.2d 1106 (1971), this court acknowledged that an attorney can delegate tasks to lay persons and stated:

"Such delegation is proper if the lawyer maintains a direct relationship with his client, supervises the delegated work, and has complete professional responsibility for the work product. [Citation omitted.]

"The work done by . . . lay persons is done as agents of the lawyer employing them. The lawyer must supervise their work and be responsible for their work product or the lack of it. [Citation omitted.]"

The MRPC also permit an attorney to delegate work to lay persons. MRPC 5.5 (1991 Kan. Ct. R. Annot. 294) states:

"A lawyer shall not:
(a)    practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or
(b)    assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law."

The Comment accompanying MRPC 5.5 specifies that "[p]aragraph (b) does not prohibit a lawyer from employing the services of paraprofessionals and delegating functions to them, so long as the lawyer supervises the delegated work and retains responsibility for their work. See Rule 5.3."

MRPC 5.3 (1991 Kan. Ct. R. Annot. 292) concerns an attorney's responsibility for nonlawyer assistants. The Comment accompanying MRPC 5.3 provides:

"Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer should give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline."

The disciplinary administrator maintains MRPC 5.3 is not applicable to suspended attorneys, arguing that "nonlawyer assistant" plainly means someone who is not an attorney and that Wilkinson, although suspended, still retains his designation as an attorney. The disciplinary administrator relies upon *State v. Schumacher*, 214 Kan. 1, 519 P.2d 1116 (1974), in which this court discussed the status of a suspended attorney:

"Just as every lawyer should avoid even the appearance of professional impropriety, a suspended attorney should avoid the appearance of failure to comply with the court's order. The Nebraska Supreme Court has suggested that this means he must refrain from the things which he did as an attorney even though he might legally do them as a layman:

It seems clear to us that the doing of such work is within the province of a lawyer to do. It is properly identified as the practice of law, whether or not it might under some circumstances .be properly performed by others not admitted to the bar. An order of suspension deprives the suspended lawyer from performing any service recognized as the practice of law. . . . A suspended lawyer will not be heard to say that services recognized as within the practice of law were performed in some other capacity when he is called to account. *State ex rel. Nebraska State Bar Assn. v. Butterfield,* 172 Neb. 645, 649, 111 N.W.2d 543 (1961)." 214 Kan. at 10-11.

*Schumacher* was filed prior to our adoption of the MRPC and also can be distinguished factually. For example, in *Schumacher,* the suspended attorney kept his office open to the general public; kept his exterior sign, advertising he was qualified to practice law in Kansas, visible to the public; permitted legal matters to be written on his letterhead; did not inform all of his clients of his suspension; was present in the courtroom during the trial of one of his former cases and passed notes to the attorney who was handling the case; and retained prepaid fees from clients.

None of those things happened in this case. Here, the client was represented well and the panel specifically found that neither the client nor the general public was injured.

Neither MRPC 5.3 nor the Comment accompanying it addresses whether an attorney suspended from the practice of law may work as a law clerk. Although MRPC 5.3 refers to "nonlawyer assistants," the term is not defined. The Comment specifically mentions an attorney can hire "assistants . . . , including secretaries, investigators, law student interns, and paraprofessionals." Assistants are not limited to the enumerated list because of the word "including." The last sentence of the Comment states that nonlawyers "do not have legal training and are not subject to professional discipline." This would seem to indicate that suspended attorneys do not fall within the nonlawyer assistant category. The Comments accompanying the MRPC, however, only provide interpretive guidance. Supreme Court Rule 226, Scope (1991 Kan. Ct. R. Annot. 227).

Regardless of whether suspended lawyers can be read into MRPC 5.3, Kansas has not addressed explicitly whether a suspended attorney may work as a law clerk. The situation is addressed implicitly in *In re Keil*, 248 Kan. 629, 631, 809 P.2d 531 (1991), in which the respondent was reinstated with two years' probation after being placed voluntarily on disability inactive status. During part of the time he was on disability inactive status, he was employed as a law clerk. It follows that if an attorney on disability inactive status may work as a law clerk, then an attorney suspended from the practice of law should be able to do the same.

Other jurisdictions have addressed whether a suspended attorney may be employed as a law clerk. In *Matter of Frabizzio*, 508 A.2d 468, 469 (Del. 1986), the Supreme Court of Delaware held that the petitioner, an attorney suspended from the practice of law for two years, could work as a law clerk or a paralegal, providing the suspended attorney has no "direct contact as a law clerk or paralegal with clients, witnesses, or prospective witnesses." The Delaware court adopted Justice Overton's reasoning in his dissent in *The Florida Bar v. Thomson*, 310 So. 2d 300 (Fla. 1975), to bar direct contact:

" 'To the layman, the difference between mere clerking and the unrestrained practice of law is not readily apparent. He observes an attorney, supposedly under suspension for unethical conduct, walking into law offices; necessarily he must wonder whether the attorney is indeed being disciplined. This confusion is compounded when the disciplined attorney is interviewing witnesses as an investigator on behalf of the law firm or otherwise discussing cases with clients. The resulting detriment to the integrity and reputation of the Bar is obvious. . . . [We also are] concerned that the attorney who is suspended or disbarred for unethical conduct, upon returning to a law office, will encounter difficulty in confining himself to strictly preparatory functions. [Citation omitted.]' " 508 A.2d at 469.

In *The Florida Bar v. Thomson,* the respondent, an attorney suspended from the practice of law, obtained employment as a law clerk. According to the respondent, he

" 'limited his functions exclusively to work of a preparatory nature such as research, taking statements of witnesses consistent with initial investigation of a case, assembling information for review, and like work that would enable the attorney-employer to carry a given matter to a conclusion through his own examination, approval or additional effort.' He adds that all of his activities have been performed under the direct supervision of the attorney-employer, and that he 'has not held himself out to be an attorney, has not signed any pleadings or letters in behalf of any attorney, has made no court appearances, has had no direct contact with any client or given any legal advice to any client and has conducted himself in the sole role of research investigator for his employer.' " 310 So. 2d at 301.

The Supreme Court of Florida held that the respondent could work as a law clerk or investigator during his suspension, agreeing with the respondent that

"the activities of a law clerk do not constitute the practice of law so long as they are limited to work of a preparatory nature such as research and investigation of details, assembly of data and similar work to enable an attorney-employer to carry a given matter to a conclusion through his own examination, approval or additional effort. [Citation omitted.]" 310 So. 2d at 302.

The court reasoned that the respondent's employment benefited the respondent, his family, his employer, the public, and the Bar. Furthermore,

"[e]mployment of [the respondent] in a supervised status within the profession seems to us to be an almost ideal manner in which he may demonstrate during his suspension his potential for rehabilitation and maintain his competency to practice law upon reinstatement. What better way is there for him to keep abreast of the law . . . ." 310 So. 2d at 302.

In *Application of Christianson,* 215 N.W.2d 920 (N.D. 1974), in dicta, the Supreme Court of North Dakota concluded that a suspended or disbarred attorney could work as a law clerk if employed by a licensed attorney. In reaching this conclusion, the court relied upon Washington and California case law. The court stated:

"The basic distinction between the activities of a law clerk and those of a lawyer is that a law clerk works for an employing attorney, while an attorney engages in professional activities for a client.

"Perhaps the most definitive statement in case law of just what a law clerk may do is embodied in the following from Ferris v. Snively, 172 Wash. 167, 19 P.2d 942 (1933):

'We realize that law clerks have their place in a law office, and we recognize the fact that the nature of their work approaches in a degree that of their employers. The line of demarcation as to where their work begins and where it ends cannot always be drawn with absolute distinction and accuracy. Probably as nearly as it can be fixed, and it is sufficient to say that it is work of a preparatory nature, such as research, investigation of details, the assemblage of data and other necessary information, and such other work *as will assist the employing attorney* in carrying the matter to a completed product, either by his personal examination and approval thereof or by additional effort on his part. The work must be such, however, as loses its separate identity and becomes either the product, or else merged in the product, of the attorney himself.' [Emphasis added.] 19 P.2d at 945.

A further statement on the same subject is as follows:

'A lawyer can employ lay secretaries, lay investigators, lay detectives, lay researchers, accountants, lay scriveners, nonlawyer draftsmen, or nonlawyer researchers. In fact, he may employ nonlawyers to do about any task for him except counsel clients about law matters, engage directly in the practice of law, appear in court or appear in formal proceedings as part of the judicial process, so long as it is he who takes the work and vouches for it to the client and becomes responsible to the client.' ABA Comm. on Professional Ethics, Opinions, No. 316 (Supp. 1967), quoted from 71 Colum. L. Rev. 1153, 1172.

"In In re McKelvey, 82 Cal. App. 426, 255 P. 834 (1927), a disbarred attorney, upon application for reinstatement, was held not to have engaged in the practice of law during the 10-year period following his disbarment although the evidence showed that he had been employed as a law clerk for brief intervals during that period and that he had, as a law clerk, done research and prepared briefs and pleadings and had given advice on minor legal matters to clients of his attorney-employer.

"The court held that the petitioner had not attempted by these actions to practice law indirectly and thus evade the effect of his disbarment in light of the fact that the evidence failed to show that he was:

1. Obtaining clients;
2. Retaining his former clients;
3. Serving clients with the connivance of another attorney and through the use of another attorney's name; or
4. Receiving a law clerk's salary as a surrogate for legal fees.

"A disbarred attorney who is ostensibly employed as a clerk in the office of a licensed attorney engages in the practice of law when he retains his own clients, acts independently of the licensed attorney in matters regarding legal advice, and handles legal matters in toto, in that the alleged attorney-employer has knowledge of the existence of such matters but does not supervise or manage their progress and disposition. [Citation omitted.]" 215 N.W.2d at 926-27.

Kansas case law is consistent with the other jurisdictions cited in that an attorney suspended from the practice of law cannot hold himself or herself out to be an attorney, either through signing letters and pleadings or appearing in court; cannot counsel clients about legal matters; and cannot maintain or retain clients. The suspended attorney remains a member of the Kansas Bar, subject to the provisions of the MRPC, and, thus, subject to being disciplined or disbarred by this court if he or she exceeds or abuses his or her employment. Both the suspended attorney and the attorney-employer are subject to discipline if the suspended attorney engages in the unauthorized practice of law or in unethical professional conduct.

The consensus is that an attorney suspended from the practice of law may obtain employment as a law clerk, providing there are certain limitations upon the suspended attorney's activities. Regarding limitations, we are persuaded the better rule is that an attorney who has been disbarred or suspended from the practice of law is permitted to work as a law clerk, investigator, paralegal, or in any capacity as a lay person for a licensed attorney-employer if the suspended lawyer's functions are limited exclusively to work of a preparatory nature under the supervision of a licensed attorney-employer and does not involve client contact. Any contact with a client is prohibited. Although not an inclusive list, the following restrictions apply: a suspended or disbarred lawyer may not be present during conferences with clients, talk to clients either directly or on the telephone, sign correspondence to them, or contact them either directly or indirectly.

Obviously, we do not accept that a disbarred or suspended lawyer may engage in all activities that a nonlawyer may perform. By barring contact with the licensed attorney-employer's clients, we prohibit a disbarred or suspended attorney from being present in the courtroom or present during any court proceedings involving clients.

Here, Wilkinson maintains he was not practicing law. He claims to have worked as Pierson's law clerk, under the direction or supervision of Pierson, and not to have acted on his own. He testified he did not draft any of the documents, did not appear in court, and never offered advice or suggestions to Rice outside the presence of Pierson. Wilkinson states he did not present himself as an attorney—he disclosed the fact that he was suspended from the practice of law to both Rice and Hupp. Rice did not pay Wilkinson—Rice paid Pierson, and then Pierson reimbursed Wilkinson for services rendered as a law clerk.

When asked if it was his understanding that law clerks can give legal advice, Wilkinson stated, "Under the supervision of any attorney. I'm not rendering advice, I'm working with—and [the licensed attorney] actually has the responsibility."

Rice testified that he considered Pierson to be his attorney. Rice said that Wilkinson introduced Pierson to him and that he retained Pierson to represent him. Rice said he understood Pierson employed Wilkinson as a law clerk.

Attorney misconduct must be "established by substantial, clear, convincing, and satisfactory evidence." *In re Smith*, 243 Kan. 584, 585, 757 P.2d 324 (1988).

"The report of a hearing panel of the Board for Discipline of Attorneys, while advisory only, will be given the same dignity as a special verdict by a jury, or the findings of the trial court, and will be adopted where amply supported by the evidence, where it is not against the clear weight of the evidence, or where the evidence consisted of sharply conflicting testimony. [Citation omitted.]" *In re Jackson*, 249 Kan. 172, 175, 814 P.2d 958 (1991).

This state is blessed with talented, conscientious attorneys who give freely of their time to serve on disciplinary panels and as investigators of complaints. This court is very appreciative of that fact. Nonetheless, our duty is to the law, and, despite our great respect for the panel members in this case, we are of the opinion the alleged misconduct of the unauthorized practice of law has

not been established clearly and convincingly. This is due, in part, to our failure previously to have given clear and concise directions to the Bar concerning what a disbarred or suspended lawyer employed by a licensed lawyer may do. This opinion is intended to remedy that situation.

Before proceeding to the final issue in this case, we will comment briefly on Wilkinson's argument that if no injury or potential injury to the client or the general public occurs, a disciplinary proceeding violates Wilkinson's constitutional right to free speech.

An attorney's First Amendment rights can be regulated. In *In re Anderson,* 247 Kan. 208, 212, 795 P.2d 64 (1990), *cert. denied* ____ U.S. ____, 111 S. Ct. 985 (1991), this court stated:

" '[A]n attorney's right to free speech is tempered by his obligation to both the courts and the bar, an obligation to which ordinary citizens are not held. In the case of *In re Sawyer,* 360 U.S. 622, 3 L. Ed. 2d 1473, 79 S. Ct. 1376 [1959], the last case in which the United States Supreme Court addressed itself to the subject, it appears that at least five justices agreed that the right to free speech may not be invoked to protect an attorney against discipline for unethical conduct.' [Citation omitted.]"

See, *e.g., In re Johnson,* 240 Kan. 334, 335, 729 P.2d 1175 (1986)(DR 8-102[B] [1991 Kan. Ct. R. Annot. 215] restricts an attorney's First Amendment rights by "prohibiting a lawyer from knowingly making a false accusation against a judge or other adjudicatory officer"); *State v. Russell,* 227 Kan. 897, Syl. ¶ 3, 610 P.2d 1122 ("Although a lawyer may speak out and state his opinions on current campaign issues without fear of jeopardizing his license to practice law, his First Amendment rights are not absolute. The guarantee of freedom of speech will not protect him from disciplinary action as a lawyer if he is guilty of known falsehood intentionally used and published for the purpose of misleading the voters and gaining personal advantage for himself or his candidate."), *cert. denied* 449 U.S. 983 (1980).

Wilkinson contends there is an important distinction in whether there was injury or potential injury to the client or the public. He concedes that if there is injury or potential injury, this court has the inherent power to regulate the profession. See *Martin v. Davis,* 187 Kan. 473, 478-79, 357 P.2d 782 (1960), in which this court stated:

"[T]he practice of law is so intimately connected and bound up with the exercise of judicial power in the administration of justice that the right to regulate the practice naturally and logically belongs to the judicial department of the government. [Citation omitted.] Included in that power is the supreme court's inherent right to prescribe conditions for admission to the Bar, to define, supervise, regulate and control the practice of law, whether in or out of court, and this is so notwithstanding acts of the legislature in the exercise of its police power to protect the public interest and welfare. [Citations omitted.]"

Wilkinson asserts that if there is no injury or potential injury, there is no need to protect the public interest and welfare; thus, this court's inherent power to regulate the profession ceases.

Wilkinson's argument fails to take into account *State v. Callahan*, 232 Kan. 136, 142, 652 P.2d 708 (1982), in which this court concluded that "[d]isciplinary proceedings are for the protection and benefit of the public at large. [Citation omitted.] Professional misconduct is not excused because ultimately no loss is suffered. [Citations omitted.]"

Because an attorney's freedom of speech can be curtailed in the interest of regulating the profession and because a showing of injury or potential injury is not required, Wilkinson's argument, although creative, must fail.

Wilkinson's final argument is that he did not fail to cooperate with the disciplinary administrator's investigation in violation of Supreme Court Rule 207 (1991 Kan. Ct. R. Annot. 149).

Bruce Miller, Disciplinary Administrator, sent Wilkinson a letter dated January 12, 1990. The letter stated that a letter of complaint about Wilkinson's alleged activities had been received and a copy was enclosed and that the matter had been referred to the chairman of the Ethics and Grievance Committee of the Topeka Bar Association for investigation. Wilkinson's response was requested.

Wilkinson testified he did not receive Miller's letter. The letter was returned to the Disciplinary Administrator's office as "undeliverable as addressed, no forwarding address on file." The letter had been sent to the address on file with the Clerk's office; however, the address no longer was current. Wilkinson stated that he notified the Clerk's office of his new address in the fall of 1989, prior to Miller's letter being sent to the old address;

however, an employee of the Clerk's office later informed him that his notification had "slipped through the cracks." No evidence was offered to the contrary.

A Topeka attorney and member of the Ethics and Grievance Committee, who had been appointed to investigate the complaint against Wilkinson, sent Wilkinson a letter dated February 21, 1990. The letter stated:

"If you have any written response to the assertions that you were acting as Earl Rice's attorney or would like to explain your relationship to this transaction between Rice and Hupp, I would very much appreciate your input so it can be considered as part of my report."

The letter also indicated a copy of J.B. King's letter, which formed the basis of the complaint against Wilkinson, was enclosed.

The disciplinary administrator contends that once Wilkinson received that letter, he had notice of a pending complaint, but chose not to respond and offered no "rational explanation" for failing to cooperate.

Wilkinson acknowledged receiving the letter, but stated a copy of the complaint letter was not enclosed. Wilkinson admitted he did not respond. When asked why he did not respond or let someone know there was no enclosure, Wilkinson testified:

"A. Well, I figured the complaint had already been filed, and if a complaint had been filed I—before I would respond, I'd want to see what the charges were. And I think that just goes to basic process, if they're going to file a complaint against you, why, they'll make sure you get a copy of it and in a meaningful and timely way, and they hadn't done that. . . .

. . . .

"Q. Did you intend not to be cooperative?

"A. No.

"Q. And it was the tone and the people involved that told you probably it was wiser not to respond.

"A. I felt that until they furnished me with the charges that they were charging me with, there was no need to respond. I think that's fundamental."

Wilkinson testified he filed an answer to the complaint as soon as he received the disciplinary administrator's letter and a copy of the complaint letter.

Wilkinson also points out that the investigator's letter said "if" Wilkinson had a response to the alleged complaint, he should

share it with the investigator. Wilkinson correctly notes that "if" does not require a response.

In comparison to other cases in which this court upheld a panel's finding that the respondent failed to cooperate in the investigation, the evidence against Wilkinson is weak. See, *e.g.*, *Smith*, 243 Kan. at 586 ("respondent failed to appear before the disciplinary panel, failed to cooperate with the disciplinary administrator or respond to requests of the administrator or the investigating attorneys, and failed to appear in this court"). Although it would have behooved Wilkinson to inquire about the enclosure that he testified was not enclosed, the investigator's letter did not specifically require a response from him. Wilkinson responded and cooperated in the investigation upon receiving notice of the complaint against him. The record before us fails to prove, by clear and convincing evidence, that Wilkinson failed to cooperate in the investigation.

IT IS, THEREFORE, ORDERED that the complaint against John E. Wilkinson be dismissed.