No. 87,900

In the Matter of STANLEY R. JUHNKE, *Respondent*.

(41 P.3d 855)

Opinion filed March 8, 2002.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*Thomas J. Berscheidt*, of Great Bend, argued the cause for respondent and *Stanley R. Juhnke*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Stanley J. Juhnke, of Hutchinson, an attorney admitted to the practice of law in Kansas. The hearing panel concluded that respondent had violated KRPC 5.3(b) (responsibilities regarding nonlawyer assistants) (2001 Kan. Ct. R. Annot. 422) and KRPC 5.5(b) (unauthorized practice of law) (2001 Kan. Ct. R. Annot. 424). Several other alleged rule violations were dismissed. The panel recommended unpublished censure. Respondent has filed no exceptions to the hearing report, requesting only that no greater discipline be imposed.

The panel found and concluded as follows:

## FINDINGS OF FACT

"*Assisting in the Unauthorized Practice of Law*

"2. On March 2, 1984, Charles K. Hyter voluntarily surrendered his license to practice law in the state of Kansas. Mr. Hyter surrendered his license following his conviction on a felony charge of income tax evasion. *See In re Hyter*, 235 Kan. 1, 1-2, 677 P.2d 1017 (1984). Thereafter, on March 6, 1984, the Kansas Supreme Court accepted Mr. Hyter's voluntary surrender of his license to practice law and entered an order disbarring Mr. Hyter.

"3. Mr. Hyter served a prison sentence from May, 1984, through July, 1984. After being released from prison, in August, 1984, Mr. Hyter went to work for the Respondent as a legal assistant on a part-time basis. [From April 1996 until his discharge on August 18, 2000, Hyter's employment with respondent was on a full-time basis.] Initially, Mr. Hyter assisted the Respondent with appellate brief writing. Thereafter, Mr. Hyter's responsibilities expanded to whatever was placed on his desk. Because he had extensive experience in the areas of real estate, probate, and business practice, Mr. Hyter handled many cases in these areas.

"4.   Eventually, Mr. Hyter's duties included writing contracts, maintaining client files, meeting clients personally and telephonically, writing letters, preparing pleadings, and providing legal advice.

"5.   Neither Mr. Hyter nor the Respondent held Mr. Hyter out as being a licensed attorney. However, Mr. Hyter testified that he had from 175 to 300 client conferences per year, and from 3 to 20 telephone calls per day.

"6.   The Respondent knew that Mr. Hyter was writing contracts, maintaining client files, meeting clients personally and telephonically, writing letters, preparing pleadings, and providing legal advice. The Respondent billed his clients for Mr. Hyter's time at the same rate as that which he billed for his own time.

### "Childs Case (DA7989)

"7.   Childs Electric, Heating, and Air Conditioning (hereinafter 'Childs'), the Respondent's client, held a lien interest in a property. The property was the subject of litigation in *JCC, Inc., d/b/a Childs Electric, Heating & A/C vs. MAS Investments, L.L.C., et al.,* Reno County District Court case numbered 97C117. Childs sold its lien interest in the property to Clark Real Estate (hereinafter 'Clark').

"8.   On February 3, 1998, the Respondent was present at a pretrial conference regarding the Childs' interest in the subject property. At that time, the court dismissed Childs' interest in the claim of proceeds by the District Court, because Childs had previously sold its interest to Clark.

"9.   Later, because property taxes had not been paid, the property subject to the lien interest was sold at a sheriff's sale pursuant to *Board of County Commissioners vs. Albright, et al.,* Reno County District Court case numbered 98C120. After the taxes were satisfied, a residue amount was left. Joseph O'Sullivan, in his capacity as counsel for the county, notified the Respondent of the residue.

"10.   Mr. Hyter handled the Childs' case for the Respondent. When Mr. Hyter received the notification from Mr. O'Sullivan, Mr. Hyter prepared a Motion for Distribution of Overage. The Respondent signed the motion, which was filed with the District Court of Reno County, Kansas. At the time when the motion was prepared, the Respondent should have known and Mr. Hyter knew that Childs no longer held any interest in the property.

"11.   On December 18, 1998, a hearing was held on the Motion for Distribution of Overage. The Respondent appeared at that hearing. A journal entry was prepared and a check in the amount of $2,231.36 was drawn on the account of the Clerk of the District Court, payable to Childs.

"12.   In December, 1998, Mr. Hyter forged the signature of Childs, cashed the check, and converted the funds to his own use.

"13.   On January 11, 1999, Clark filed a separate Motion for Payment of Proceeds to Lienholder. On January 26, 1999, an order was issued authorizing payment of $2,231.36 to Clark, which the Clerk of the District Court thereafter disbursed from her account to Clark.

"14. In 1999, Mr. O'Sullivan was contacted by Sharon Hockersmith. Ms. Hockersmith was entitled to receive in excess of $11,000 of the residue. When Mr. O'Sullivan attempted to have her share of the residue paid to her he discovered that there were not sufficient funds in the account to cover Ms. Hockersmith's share. Mr. O'Sullivan reviewed the account and discovered that the lien interest, formerly held by Childs had been paid twice—to Childs and to Clark.

"15. On October 14, 1999, Mr. O'Sullivan wrote to the Respondent explaining in detail that Childs was not entitled to the money from the sale proceeds, that Ms. Hockersmith had been injured as a result of the Respondent's representations to the District Court, and that the Respondent may have violated several rules of the Kansas Rules of Professional Conduct. Because the Respondent did not see Mr. O'Sullivan's letter, the Respondent did not contact Mr. O'Sullivan. Instead, Mr. Hyter called Mr. O'Sullivan and stated that there had been a mistake and that the money would be returned.

"16. When he did not receive the refund and when he did not hear from the Respondent, on June 22, 2000, Mr. O'Sullivan filed a Motion for an Order Resolving Duplicate Payment and Ordering Refund. The matter was scheduled for hearing. Prior to the hearing, Mr. Hyter called Mr. O'Sullivan and requested a continuance of the hearing. In response, on July 6, 2000, Mr. O'Sullivan sent a letter to the Respondent *via* facsimile confirming the contents of the telephone conference between Mr. O'Sullivan and Mr. Hyter.

"17. Mr. Hyter made notes in the margins of Mr. O'Sullivan's letter of July 6, 2000, and sent the marked letter to Mr. O'Sullivan *via* facsimile.

"18. On July 27, 2000, Mr. Hyter delivered a cashier's check to Mr. O'Sullivan's office in the amount of $2,531.36. [The amount returned, $2,531.36, included $300 in attorney fees paid by Mr. O'Sullivan in connection with obtaining the refund.]

"19. On August 18, 2000, the Respondent received a copy of a complaint filed by Mr. O'Sullivan from the Disciplinary Administrator's office regarding the Childs case. That morning, the Respondent confronted and terminated Mr. Hyter.

"20. After terminating Mr. Hyter, the Respondent audited his files to determine if Mr. Hyter had engaged in other misconduct. At that time, the Respondent did not discover any other irregularities.

### *"Watertite Case (DA8069)*

"21. The Respondent represented Watertite Roofing Company (hereinafter 'Watertite') in a collection matter. After the Respondent was initially unable to resolve the case, the Respondent prepared and filed a civil suit in the District Court of Reno County, Kansas.

"22. The Respondent obtained a judgment in favor of his client, Watertite. The Respondent was unable to collect the judgment, and thereafter, filed the judgment of record in Pratt County, Kansas.

"23. Mr. Hyter, without the knowledge or permission of Watertite or the Respondent, contacted the defendants and reached an agreement regarding the

judgment. Mr. Hyter and counsel for the defendants prepared an agreed upon Journal Entry of Judgment. In the journal entry, Mr. Hyter agreed to settle the judgment previously filed for $1,066.50. Mr. Hyter forged the Respondent's signature on the Journal Entry of Judgment. Thereafter, the journal entry was filed in the Pratt County District Court on June 23, 1999. On July 22, 1999, Mr. Hyter received a check in the amount of $1,100.00. Mr. Hyter forged the check, and deposited the funds into his personal account.

"24.   Mr. Hyter prepared a release and satisfaction of judgment in case numbered 97JL27. Mr. Hyter forged the Respondent's signature on the release and satisfaction of judgment, and on August 22, 1999, filed the same with the Pratt County District Court.

"25.   On October 13, 2000, the Respondent learned that Mr. Hyter settled the case, converted the funds, and forged the Respondent's name on the pleadings. The Respondent did not discover the problems in this case during his earlier audit of his files because there were no supporting documents in the file.

"26.   At the hearing on this matter, the Respondent testified that prior to Mr. Hyter's disbarment, Mr. Hyter was a skilled attorney. The Respondent further testified that because Mr. Hyter was capable, the Respondent did not find it necessary to supervise Mr. Hyter's work.

"27.   On October 16, 2000, the Respondent apologized to Mike and Nancy Oden, the owners of Watertite. Along with the letter of apology, the Respondent forwarded a check for restitution in the amount of $7,487.08.

## "CONCLUSIONS OF LAW

"Based upon the above findings of fact the Hearing Panel makes the following conclusions of law:

"1.   KRPC 5.3 provides as follows:

'With respect to a nonlawyer employed or retained by or associated with a lawyer:

. . .

(b)   a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer[.]'

*Id.* In this case, the Respondent failed to provide adequate supervision of Mr. Hyter. The Respondent treated Mr. Hyter as though he was a partner or associate, rather than a law clerk. Because Mr. Hyter had been convicted of a felony crime of dishonesty, the Respondent should have supervised Mr. Hyter's conduct to ensure that the Respondent's clients were adequately safeguarded. The Respondent failed to take steps necessary to ensure that Mr. Hyter complied with the Kansas Rules of Professional Conduct and the criminal statutes of Kansas. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 5.3.

"2.   The Respondent is charged with assisting a disbarred attorney, Charles K. Hyter, with the unauthorized practice of law. KRPC 5.5(b). A general definition of the 'practice of law' has been quoted with approval as follows:

'As the term is generally understood, the "practice" of law is the doing or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity to the adopted rules of procedure. But in a larger sense it includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured, although such matter may or may not be depending in a court.'

*State ex rel. v. Perkins*, 138 Kan. 899, 907-8, 28 P.2d 765, 769 (1934) (*quoting Eley v. Miller*, 7 Ind. App. 529, 34 N.E. 836). In addition to that general definition, the Court has set forth what suspended and disbarred attorneys may and may not do:

'The consensus is that an attorney suspended from the practice of law may obtain employment as a law clerk, providing there are certain limitations upon the suspended attorney's activities. Regarding limitations, we are persuaded the better rule is that an attorney who has been disbarred or suspended from the practice of law is permitted to work as a law clerk, investigator, paralegal, or in any capacity as a lay person for a licensed attorney-employer if the suspended lawyer's functions are limited exclusively to work of a preparatory nature under the supervision of a licensed attorney-employer and does not involve client contact. **Any contact with a client is prohibited. Although not an inclusive list, the following restrictions apply: a suspended or disbarred lawyer may not be present during conferences with clients, talk to clients either directly or on the telephone, sign correspondence to them, or contact them either directly or indirectly.**

'Obviously, we do not accept that a disbarred or suspended lawyer may engage in all activities that a nonlawyer may perform. By barring contact with the licensed attorney-employer's clients, we prohibit a disbarred or suspended attorney from being present in the courtroom or present during any court proceedings involving clients.' *In re Wilkinson*, 251 Kan. 546, 553-54, 834 P.2d 1356 (1992) (emphasis added).

Attorneys who employ suspended or disbarred attorneys, are 'subject to discipline if the suspended [or disbarred] attorney engages in the unauthorized practice of law or in unethical professional conduct.' *Id.* at 553. In this case, Mr. Hyter engaged in the unauthorized practice of law while employed as a law clerk for the Respondent. The Respondent was aware that Mr. Hyter met with clients and engaged in other activity that constitutes the practice of law. Mr. Hyter's unauthorized practice of law spanned many years. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 5.5(b).

"3. The Disciplinary Administrator alleged in the Formal Complaint that the Respondent also violated KRPC 1.3, KRPC 1.15(a), KRPC 1.15(b), KRPC 3.1, KRPC 3.3(a), KRPC 8.4(d), and KRPC 8.4(g). The evidence does not support findings that the Respondent violated those rules. Therefore, the allegations in the Formal Complaint that the Respondent violated KRPC 1.3, KRPC 1.15(a),

KRPC 1.15(b), KRPC 3.1, KRPC 3.3(a), KRPC 8.4(d), and KRPC 8.4(g), are dismissed."

## RECOMMENDED SANCTION

Based on these findings and conclusions, the panel recommended censure by this court and that such censure not be published in the Kansas Reports. The panel considered the following standards as well as mitigating and aggravating circumstances:

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the profession to comply with the rules and decision of the court.

"*Mental State.* The Respondent negligently violated his duty.

"*Injury.* Watertite, the Respondent's client, suffered an actual injury as a result of the Respondent's misconduct. Certainly, however, the injury suffered by Watertite was completely mitigated by the timely payment of restitution by the Respondent. Watertite's owners remained clients of the Respondent even after this incident occurred.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Prior Disciplinary Offenses. The Respondent was previously informally admonished on June 12, 1987 for violating DA 1-102(A)(5), DR 4-101(B)(2), and DR 5-105(A). [The final hearing report further notes: "At the time the Respondent was disciplined in 1987, the disciplinary rules in the state of Kansas were known as the Disciplinary Rules of the Code of Professional Responsibility rather than the Kansas Rules of Professional Conduct."]

"Selfish Motive. The Hearing Panel concludes that the Respondent's misconduct was motivated by selfishness. The Respondent testified that he billed Mr. Hyter's time at the same rate as that which he billed for his own time. By billing Mr. Hyter's time at the rate of an attorney, while paying Mr. Hyter only as a law clerk, the Respondent dramatically increased his revenues. Accordingly, the Hearing Panel concludes that selfishness motivated the Respondent's misconduct.

"Pattern of Misconduct. The Respondent engaged in the misconduct in this case beginning in 1984. Because the misconduct was ongoing for a period of many years, the Hearing Panel concludes that the Respondent engaged in a pattern of misconduct.

"Substantial Experience in the Practice of Law. At the time of the misconduct, the Respondent had practiced law for 21 years. As such, the Respondent has substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Timely Good Faith Effort to Make Restitution. Within three days of discovering the unauthorized settlement of the Watertite judgment, the Respondent forwarded a check for restitution to his client. The Respondent's payment of restitution evidenced his good faith in this regard.

"Present and Past Attitude of Cooperation. The Respondent's attitude is a mitigating circumstance in this case. He fully cooperated with the investigation and prosecution of the disciplinary case. Additionally, the Respondent, through counsel, self-reported the Watertite case.

"Previous Good Character and Reputation. The Respondent is an active and productive member of the bar in Hutchinson, Kansas. He enjoys the respect of his peers and business associates and generally possesses a good character and reputation as evidenced by several letters received by the Hearing Panel.

"Remorse. At the hearing on this matter, the Respondent testified that he has suffered humiliation as a result of the events of this case. Additionally, as evidenced by his letter of October 16, 2000, the Respondent apologized to Watertite for the misconduct.

"Remoteness of Prior Offenses. The informal admonition administered in 1987 is remote.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered Standard 7.3. That standard provides, in pertinent part:

'Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system.'

*Id.* Based upon the findings of fact, conclusions of law, and compelling mitigating factors, the Hearing Panel unanimously recommends that Respondent be censured by the Kansas Supreme Court. The Hearing Panel further recommends that censure *not* be published in the Kansas Reports."

## DISCUSSION

To warrant a finding of misconduct, the charges must be established by clear and convincing evidence. Supreme Court Rule 211(f) (2001 Kan. Ct. R. Annot. 259); *In re Harris*, 261 Kan. 1063, 1066, 934 P.2d 965 (1997). A hearing panel's report is deemed admitted under Rule 212(c) and (d) (2001 Kan. Ct. R. Annot. 263) when respondent fails to file exceptions. *In re Howlett*, 266 Kan.

401, 969 P.2d 890 (1998); *In re Farmer*, 263 Kan. 531, 950 P.2d 713 (1997). No exceptions have been filed to the panel's report. We conclude the panel's findings of fact are supported by clear and convincing evidence and fully support the panel's conclusions of law. The panel's findings and conclusions are adopted by this court. This leaves the matter of determining the appropriate discipline to be imposed.

The facts herein will illustrate the risks involved in the employment in a legal office of a suspended or disbarred attorney and the need for close supervision of such an employee. From the record it is shown that, during the period in question, respondent's law office consisted of himself, Hyter, and two secretaries. Respondent testified that Hyter had "[v]ery good legal skills" and that he relied on him. Respondent would ask for Hyter's opinion on legal matters. Hyter was paid on an hourly basis of $18 per hour, initially, which had increased to $20 per hour by the time of his termination. Pay was computed on the basis of Hyter's timesheets. Respondent billed for Hyter's service at the same hourly rate as respondent charged for his own services. As the panel noted, under this arrangement, respondent's revenues "dramatically increased." From the disbarred or suspended attorney's standpoint, the risk of overstepping the boundaries of what he or she is legally permitted to do is far greater than that of, say, a paralegal. The disallowed legal tasks the disbarred or suspended attorney is working on may be matters he or she has felt comfortable in performing for many years while licensed to practice law. Hyter practiced law for 16 years prior to his disbarment and was experienced in the general practice of law. He obviously had difficulty accepting the fact that he was no longer legally permitted to do much of the type of work he had done in the past. As noted by the panel, respondent and Hyter's professional relationship was more that of partners or partner and associate attorney. Little or no supervision of Hyter was undertaken by respondent despite his obligation to provide close supervision and set appropriate parameters as to the work Hyter could legally perform.

The panel has recommended unpublished censure. We disagree therewith. We conclude published censure is the appropriate dis-

cipline herein, although a minority would impose greater discipline.

IT IS THEREFORE ORDERED that Stanley J. Juhnke be censured in accordance with Supreme Court Rule 203(a)(3) (2001 Kan. Ct. R. Annot. 224).

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that the costs herein be assessed to respondent.

DAVIS, J., not participating.

BRAZIL, S.J., assigned.