No. 101,746

In the Matter of THOMAS O. ROST, *Respondent.*

(211 P.3d 145)

Opinion filed July 17, 2009.

*Stanton A. Hazlett,* disciplinary administrator, argued the cause and was on the brief for the petitioner.

*Dan E. Turner,* of Turner & Turner, of Topeka, argued the cause and *Phillip L. Turner,* of same firm, was with him on the brief for respondent, and *Thomas O. Rost,* respondent, argued the cause pro se.

*Per Curiam:* This case is an original, contested disciplinary action against Thomas O. Rost, who was admitted to practice law in this state on February 16, 1966, but who has registered with the Kansas Supreme Court as being on retired status since October 1, 2005. The formal complaint filed by the office of the Disciplinary Administrator contained two counts, designated as Cases Nos. DA9925 and DA10014. The overarching allegation is that Rost continued to actively practice law while on retired status. See Supreme Court Rule 208(a) and (f)(1) (2008 Kan. Ct. R. Annot. 307) (attorney registered as retired not permitted to practice law in this state).

Rost's current retired status was the result of three prior disciplinary complaints, DA8437, DA8440, and DA8946. In those cases, the Disciplinary Administrator agreed to recommend that Rost receive an informal admonishment in exchange for Rost's agreement to retire from the practice of law by October 1, 2005. As part of a June 6, 2005, "settlement" agreement with the Disciplinary Administrator, Rost agreed to immediately begin the transition of all of his pending "cases, guardianships and conservatorships[,] and other legal business" to a Kansas licensed attorney and to file petitions to obtain court approval to resign from any active guardianships and/or conservatorships. The review committee accepted the agreement, and the Disciplinary Administrator informally admonished Rost for violating Kansas Rule of Professional Conduct (KRPC) 1.5 (2008 Kan. Ct. R. Annot. 448) (attorney fees) and

KRPC 8.4 (2008 Kan. Ct. R. Annot. 586) (misconduct). Rost took retired status with the Clerk of the Appellate Courts effective October 1, 2005.

Apparently in conjunction with his "retirement," Rost entered into an agreement to sell his "client base and files" to Eric Kjorlie, an attorney who rented office space in Rost's law office building. The purchase price was "five times his net earnings from the 2004 practice of law," payable solely from "the proceeds of [Rost's] client base." The parties agreed "to share expenses on agreed items such as copier, stamp machine, etc." and Rost agreed to provide "administrative assistance" to Kjorlie. Kjorlie testified that, pursuant to the agreement, he retained one-half of any fee generated from Rost's client base to utilize for expenses, giving Rost the other half as payment upon the agreement. The Disciplinary Administrator did not challenge the propriety of this agreement, and any issue in that regard is not currently before the court.

After retiring, Rost began a self-described consulting business at the same location where he had practiced law, and where he had previously been associated with his father in the practice of law. Rost changed the sign in front of the building from "Rost & Rost Attorneys at Law" to "Rost & Rost Consulting, Incorporated," albeit there was no other Rost associated with the new business.

The count designated as case DA9925 emanated from a complaint filed with the Disciplinary Administrator by Shawnee County District Judge Frank Yeoman, who was presiding over certain conservatorship cases in which Rost was involved, after his retirement. The judge was particularly concerned about an April 14, 2006, letter signed by Rost, which was on "Rost & Rost Attorneys at Law" letterhead, and which explained that a delay in filing a conservatorship final accounting was due to the illness of Rost's paralegal. The judge noted that, even after his retirement, Rost had "continued to identify himself with name and [attorney] registration number" in all of the documents filed in the conservatorship cases and that it appeared to the judge that Rost continued "to maintain the same staff, work out of the same office, and even . . . use the same letterhead identifying him as an attorney." The judge ex-

pressed his concern that a client might not be able to discern that Rost was no longer permitted to actively practice law.

The count designated DA10014 arose from a complaint letter from James G. Chappas, a Kansas attorney hired by Mr. David Lloyd to find out what Rost had done to earn the fees Lloyd had paid to Rost. Chappas was unable to obtain an itemization and documentation of the work performed for those fees. Rost's relationship with Lloyd began prior to Rost's retirement but continued thereafter.

The Disciplinary Administrator assigned Scott Hesse to investigate the complaints. Hesse interviewed Judge Yeoman, Lloyd, Chappas, and the respondent, Rost. During his 2006 interview with Rost, Hesse observed that Rost's law school diploma and certificates of bar admission issued by the Kansas Supreme Court and the Kansas federal district court were displayed on the office walls. Hesse also noticed a check on Rost's desk that was payable to "Rost and Rost, Attorneys at Law."

In the interview with Hesse, Rost labeled himself a "paralegal." Rost related that he would go to court with his former clients and their new attorney and explain what was going on in the case, so that the new attorney would not need to look through a thick case file. Also during the interview, Hesse did an internet search of Rost's name and discovered three websites identifying Rost as an attorney actively practicing criminal law, one of which had been updated in March 2006. Rost denied knowingly advertising on those websites.

In answering the formal complaint, Rost asserted that the hearing panel did not have jurisdiction to discipline a retired attorney. In response, the panel scheduled a prehearing conference, at which Rost was instructed to file a formal motion challenging jurisdiction. Rost's May 13, 2008, formal motion to dismiss was overruled by the panel, and Rost sought relief from that ruling from the Supreme Court. On July 14, 2008, this court overruled Rost's motion, finding that the Supreme Court and the Disciplinary Administrator had jurisdiction to consider the disciplinary complaints, notwithstanding Rost's retired status. Thereafter, the hearing panel

proceeded with the formal hearing, with Rost continuing to object to jurisdiction.

Following the hearing, the panel filed a final hearing report on January 12, 2009, in which it found that Rost had violated KRPC 5.5(a) (2008 Kan. Ct. R. Annot. 565) (unauthorized practice of law); KRPC 8.4(d) (2008 Kan. Ct. R. Annot. 586) (conduct prejudicial to the administration of justice); and Kansas Supreme Court Rule 208(a) (2008 Kan. Ct. R. Annot. 307) (only attorneys registered as active may practice law in Kansas). Pursuant to Supreme Court Rule 212 (2008 Kan. Ct. R. Annot. 327), Rost filed exceptions to the panel's findings and submitted a brief to this court. Accordingly, we set forth the panel's factual findings:

"FINDINGS OF FACT

"16. The Hearing Panel finds the following facts, by clear and convincing evidence:

"17. Thomas O. Rost (hereinafter 'the Respondent') is an attorney at law, Kansas Attorney Registration No. 6297. His last registration address with the Clerk of the Appellate Courts of Kansas is 827 Southwest Topeka Boulevard, Topeka, Kansas 66612. The Respondent was admitted to the practice of law in the State of Kansas on February 16, 1966.

"18. In 2001 and 2003, three disciplinary complaints were filed against the Respondent, DA8437, DA8440, and DA8946. The Review Committee of the Kansas Board for Discipline of Attorneys directed that a Hearing Panel conduct a Formal Hearing regarding the three complaints.

"19. Prior to the hearing, the Disciplinary Administrator and the Respondent entered into an agreement regarding the resolution of the three complaints. Specifically, the Disciplinary Administrator agreed to recommend to the Review Committee that it direct that the Respondent be informally admonished by the Disciplinary Administrator for the rule violations in the three disciplinary cases in return for the Respondent's agreement to retire from the practice of law. The Disciplinary Administrator and the Respondent submitted the agreement to the Review Committee.

"20. The Review Committee accepted the agreement of the parties and directed that the Disciplinary Administrator informally admonish the Respondent for the rule violations contained in DA8437, DA8440, and DA8946. The Respondent registered with the Clerk of the Appellate Courts as retired, as of October 1, 2005.

"21. In an undated agreement, the Respondent agreed to sell his practice to Eric Kjorlie.

"22. The Respondent and Mr. Kjorlie shared the fees that were received pursuant to the agreement. At the hearing on this matter, Mr. Kjorlie testified regarding this subject, as follows:

'Q. [By Mr. Hazlett] Do you have any—did you have any agreement with how you would handle fees under those circumstances?

'A. [By Mr. Kjorlie] Those fees would be brought in, I would put it into an account, and then we would split it out so we could maintain the office operation there in terms of sharing the fax machines, the company machines, the scanning machines, and that kind of an arrangement.

'Q. As a practical matter let's say somebody came in that was a client of Mr. Rost's and let's say this happens after October 1st of 2005, pays you a $2,000 retainer, how would that be split up?

'A. Well, if it was a client that come [sic] in on that type of a referral I would put the money into the 8227 account. Half would come in to maintain operations and expenses I could draw from that, the other half would go into this agreement and that's basically how we operated.

'Q. So half would go to the payment of this exhibit—your obligations under this exhibit 12 agreement?

'A. Right.'

"23. Prior to the Respondent's retirement, the Respondent practiced at 827 Southwest Topeka Boulevard, Topeka, Kansas. The Respondent's paralegal was Tonya McConnell. Located in front of the Respondent's building was a sign that read, 'Rost & Rost, Attorneys at Law.' During his father's lifetime, the Respondent practiced with his father.

"24. Following the Respondent's retirement, he continued to work at 827 Southwest Topeka Boulevard, Topeka, Kansas. The Respondent had the sign changed to read, 'Rost & Rost Consulting, Inc.'

DA9925

"25. On April 14, 2006, the Respondent sent a letter to the Honorable Frank Yeoman, Jr., in case number 91GC126, In re Jeffrey Dusseault. The letter was prepared on the Respondent's law firm letterhead and identified the Respondent as an attorney. The letter provided:

'This letter is in response to Mr. Hehtmanek's letter of April 13, 2006. Please be advised that within the next 14 days the final accounting for the above referenced case will be filed with the Clerk of the District Court.

'My office has been short staffed due to my paralegal having surgery and being out for 6 weeks and now back only part time.'
The Respondent's letter would lead a reasonable person to conclude that the Respondent is an active practicing attorney.

"26. On April 25, 2006, the Respondent filed a Petition for the Approval of Eighth and Final Annual Accounting in the Dusseault case. The Respondent also filed an Order for Hearing and a Notice of Hearing. The documents were signed by the Respondent and the Respondent included his attorney registration number.

"27. Judge Yeoman wrote to the Disciplinary Administrator's office regarding his observations of the Respondent. W. Scott Hesse was assigned to investigate Judge Yeoman's complaint. During the course of his investigation, Mr. Hesse

called the Respondent's office to schedule an interview. When Mr. Hesse called the Respondent, the Respondent answered the telephone and stated, 'Rost & Rost.'

"28. Mr. Hesse scheduled an interview with the Respondent in the Respondent's office. When Mr. Hesse went to the Respondent's office, he observed the Respondent's law license hanging on the wall. Additionally, Mr. Hesse observed a check at the Respondent's office titled, Rost & Rost, Attorneys at Law.

"29. During the interview, the Respondent stated that he was retired from the practice of law and considered himself a paralegal. The Respondent told Mr. Hesse that he continues to meet with clients but that if a client wanted to go to court, he would refer the client to another attorney. The Respondent stated that he would also go to court with the client and the attorney so that he could assist the attorney handling the case.

"30. The Respondent told Mr. Hesse that his client base for Rost & Rost Consulting, Inc. was the same client based as Rost & Rost, Attorneys at Law. The Respondent informed Mr. Hesse that he intended to advise his clients on business issues, including farming, real estate, military matters, and other matters.

### DA10114

"31. William Fish, a veteran, was declared incompetent by the Veterans Administration. Judge Yeoman appointed David Lloyd, a friend of Mr. Fish, as curator for Mr. Fish, so that Mr. Lloyd could manage Mr. Fish's financial matters.

"32. At the time the curatorship was initiated, Robert Coulthard represented Mr. Lloyd in his capacity as Mr. Fish's curator. Because Mr. Coulthard was unable to appear with Mr. Fish at a hearing held August 4, 2004, at Mr. Coulthard's request, Mr. Kjorlie appeared with Mr. Lloyd. At that time, and continuing to today, Mr. Kjorlie rents office space in the Respondent's building.

"33. On March 30, 2005, Mr. Lloyd came to the Respondent's office and requested that the Respondent assist him in reconstructing the records relating to the first seven months of Mr. Fish's curatorship. At that time, Mr. Lloyd paid the Respondent $600.00 from Mr. Fish's account. In the memo line, Mr. Lloyd indicated that the check was for 'Legal Fee's VA.'

"34. On March 31, 2005, Mr. Lloyd and the Respondent continued working together on reconstructing the records relating to Mr. Fish's curatorship.

"35. On April 4, 2005, Mr. Lloyd and the Respondent went to US Bank to request bank records.

"36. On May 2, 2005, Mr. Lloyd paid the Respondent $678.00 from Mr. Fish's account. In the memo line, Mr. Lloyd indicated that the check was for 'accounting for VA.'

"37. On June 24, 2005, Mr. Lloyd paid the Respondent $600 from Mr. Fish's account. In the memo line, Mr. Lloyd indicated that the check was for 'audit Bill Fish.'

"38. The first annual accounting in Mr. Fish's curatorship was due in August, 2005. However, Mr. Lloyd did not prepare and file the annual accounting as required by the Court.

"39. On October 18, 2005, Mr. Lloyd paid the Respondent $600.00 for 'attorney fees.'[1]

"40. On March 9, 2006, Mr. Lloyd received a letter from the Veterans Administration indicating that Mr. Fish's benefits were suspended because Mr. Lloyd failed to file the annual accounting in a timely manner.

"41. After Mr. Fish's benefits were suspended, Mr. Lloyd came to the Respondent's building for assistance. Thereafter, on April 26, 2006, a First Annual Accounting, covering the period from August 27, 2004, to August 26, 2005, was filed in Mr. Fish's curatorship.[2]

"42. In the First Annual Accounting, Mr. Lloyd acknowledged that he paid the Respondent a total of $1,878.00 for 'Accounting Legal Fees.'

"43. On May 15, 2006, the Office of Regional Counsel of the Veterans Administration objected to the First Annual Accounting. One of the objections was based upon the 'Accounting Legal Fees' paid to the Respondent. Another objection lodged by the Veterans Administration included:

'The ward was renting the home, which he shares with Mr. Campa, an expense for rent of $350.00 for rent to Mr. Lloyd shows each month until 1-03-05 when mortgage payment to the Educational Credit Union of $691.00 appears and does each month for the remainder of the accounting period along with repair expenses for the residence, plumbing of $1,645.69, A/C repair $197.49 and monthly expense of over $100.00 to Orkin for pest control. The assets listed shows a home with a value of $35,900.00 and a mortgage of [$]10,467.50, [sic] this belonged to the Curator David J. Lloyd and his spouse. No rent payments from Mr. Campa are reflected in the accounting.'

"44. In May, 2006, Mr. Lloyd met with the Respondent regarding the issues raised by the Veterans Administration regarding the rent and mortgage payments made and the ownership of the property where Mr. Fish resided. Mr. Lloyd paid

---

"[1] At the hearing on this matter, the Respondent testified that Mr. Lloyd's check dated October 18, 2005, but not deposited until April, 2006, was for legal fees incurred prior to his retirement from the practice of law on October 1, 2005."

"[2] The pleading appears to have been prepared and filed by Mr. Kjorlie. According to the Respondent, 'Tonya M. McConnell . . . prepared the accounting based upon Mr. Lloyd's records under the direction of Mr. Kjorlie.' According to statements made by Mr. Kjorlie to Mr. Hesse, during his investigation, Mr. Kjorlie did not prepare the accounting nor did he assist Mr. Lloyd in preparing or filing the accounting. Mr. Kjorlie's testimony regarding this matter at the Formal Hearing was less than clear. While the Respondent may have drafted the pleading, he denied doing so. Clear and convincing evidence was not presented to establish who prepared the pleading."

the Respondent $3,500 to *assist him with resolving the problem with the property.*
The Respondent told Mr. Lloyd that Mr. Lloyd would have to 'make peace' with
Mr. Kjorlie, the Court, and the Veterans Administration, over the issue with the
property.[3]

"45. The Respondent contacted the title company and determined the own-
ership of the property. The Respondent accompanied Mr. Lloyd to the bank to
determine how Mr. Lloyd financed the property.

"46. In order to resolve the problem with the property, the Respondent rec-
ommended to Mr. Lloyd that he execute a quitclaim deed regarding the property
in question in favor of Mr. Fish. On May 24, 2006, Mr. Lloyd and his wife executed
a quitclaim deed in Mr. Fish's favor. The quitclaim deed was prepared by Ms.
McConnell.

"47. On May 24, 2006, Mr. Lloyd filed an Amended Petition for the Approval
of First Annual Accounting and Approval of Successor Curator. The pleading was
prepared after Mr. Lloyd met with the Respondent. The pleading purports to
have been made and filed by Mr. Kjorlie. In the pleading, regarding the fees paid
to the Respondent, Mr. Lloyd stated:

'The legal issues and reconstruction issues totaling One Thousand Eight Hun-
dred Seventy-Eight Dollars ($1,878.00) are due to locating lost bank statements;
acquiring duplicate bank statements from the financial institution; reconstruction
of the transactions during this accounting period using the bank statements, can-
celled checks and check registers, which took a number of hours in order to
prepare the First Annual Accounting.'

Further, in response to the issue raised concerning the rent and mortgage pay-
ments made and the ownership of the property, Mr. Lloyd stated:

'3. That the Petitioner prior to the curatorship on August 19, 2002, purchased
a 24' x 41' mobile home and placed the mobile home on four (4) lots that were
owned by the Petitioner and then sold the mobile home and lots to William A.
Fish for a total amount of Twenty-Five Thousand Three Hundred Dollars
($25,300.00).

'4. That William A. fish [sic] at the time could not qualify for a loan to purchase
a living space for himself and his caregiver.

'5. That the Petitioner states that the loan is now paid in full and the home and
lots are deeded to William A. Fish.

'6. Any sum shown as rent was made as loan payments not rent.

. . . .

---

"[3] Despite the assertions that Mr. Kjorlie assisted Mr. Lloyd during this time, it
does not appear that Mr. Lloyd paid attorney fees to Mr. Kjorlie. The only fees
paid by Mr. Lloyd during this time appear to have been paid to the Respondent."

'8. That the Petitioner states that Raymond R. Campa is not a tenant; Raymond R. Campa is a full time caregiver and receives monthly room and board along with a weekly salary in the amount of Three Hundred Eleven Dollars ($311.00).'

Finally, Mr. Lloyd requested that Mr. Kjorlie be appointed as successor curator.

"48. Mr. Lloyd suffered various health problems and had difficulty in recalling the reason for paying the Respondent the $3,500.00. On June 19, 2006, Mr. Lloyd retained James G. Chappas to assist him in determining what Mr. Lloyd had paid the Respondent to do. To that end, Mr. Chappas wrote to the Respondent.

"49. On June 28, 2006, Mr. Kjorlie responded to Mr. Chappas in behalf of the Respondent, informed Mr. Chappas that he was representing the Respondent, and stated that Mr. Lloyd paid the Respondent the $3,500 for a business financial analysis relating to ownership by Mr. Lloyd of a piece of real estate.

"50. On June 29, 2006, Mr. Chappas wrote to Mr. Kjorlie and requested an itemization of the time expended in earning the $3,500.00. Neither the Respondent nor Mr. Kjorlie provided Mr. Chappas or his client with an itemization of the time expended in earning the $3,500.00.

"51. On July 6, 2006, Judge Yeoman sent Mr. Kjorlie a letter regarding the Amended First Annual Accounting. In the letter, Judge Yeoman stated:

'The appearance of payments as reflected in the accounting made to Rost & Rost is rather "out of the blue" since Thomas Rost had nothing to do with this case that was known to the Court. I have since learned more about this situation (VA attorney had made inquiry before me) so I am now at least informed that Mr. Lloyd went to Rost for help with his accounting. Why he would do that I do not know! Lloyd's records were, so I am told, in disarray and he required help. Rost was not his attorney, you were, and you have insisted that you and Rost have only an office sharing relationship.

'The payments were made for "accounting legal fees," whatever that terminology may mean. I know Mr. Rost is not an accountant and was, at that time, engaged in the practice of law. Lloyd was not authorized to pay a lawyer by use of the curatorship assets for services rendered without having first obtained permission of the Court by appropriate pleadings and order. The curator is ordered to re-imburse the estate for all sums paid from the curatorship to the law firm of Rost and Rost — to the best of my knowledge that would be the total sum of $1,878.00 based on what is reported. He will have the opportunity to show, by appropriate documentation, the justification for the payments and this order will be reconsidered if he does that.'

"52. Mr. Kjorlie responded to the judge's letter on July 20, 2006. In that letter, Mr. Kjorlie explained what the Respondent did to earn the $1,878.00 in fees. Mr. Kjorlie, however, failed to file a motion with the Court to allow the fees.

"53. On September 4, 2006, Mr. Chappas wrote to Mr. Kjorlie and requested information regarding the Respondent's malpractice carrier.

"54. On September 20, 2006, Mr. Kjorlie wrote to Mr. Chappas. Mr. Kjorlie did not provide Mr. Chappas with information regarding the Respondent's mal-

practice carrier. Regarding the $3,500.00, Mr. Kjorlie stated: 'Mr. Rost, in addition, through a great deal of time and effort was able to work out the real estate transaction for which he charged Mr. Lloyd a commission . . .'

"55. On September 27, 2006, the Respondent sent a letter to the Disciplinary Administrator's Office. The letter was prepared on the Respondent's law firm letterhead and identified the Respondent as an attorney. However, on September 28, 2006, Ms. McConnell wrote to the Disciplinary Administrator's Office and explained that she was at fault for sending the letter the day before on attorney letterhead.

"56. On October 6, 2006, Mr. Kjorlie wrote to Mr. Chappas. Mr. Kjorlie asserted that he does not represent the Respondent in regard to the Fish Curatorship. Additionally, Mr. Kjorlie stated:

'. . . It is my understanding that at the request of Mr. Lloyd, Mr. Rost as a matter of a business consultation did a background investigation as it relates to the Education Credit Union for a set consulting fee and not as previously stated as a real estate commission, which is inaccurate.' "

## STANDARD OF REVIEW

In disciplinary proceedings, this court considers the evidence, the findings of the hearing panel, and the arguments of the parties and determines whether KRPC violations exist, and, if so, what discipline should be imposed on the respondent. *In re McPherson*, 287 Kan. 434, 440-41, 196 P.3d 921 (2008); *In re Lober*, 276 Kan. 633, 636, 78 P.3d 442 (2003). Attorney misconduct must be established by clear and convincing evidence. *In re Nelson*, 288 Kan. 179, 183, 200 P.3d 1262 (2009); Supreme Court Rule 211(f) (2008 Kan. Ct. R. Annot. 313). To be clear and convincing, evidence must establish the truth of the facts asserted is "highly probable." *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3, 187 P.3d 594 (2008). In making that determination, the appellate court should refrain from weighing conflicting evidence, assessing witness credibility, or redetermining questions of fact. *In re B.D.-Y.*, 286 Kan. at 699.

## HEARING PANEL LEGAL CONCLUSIONS

In finding a violation of KRPC 5.5(a) (2008 Kan. Ct. R. Annot. 565), which prohibits the unauthorized practice of law, the panel relied in part on *State v. Schumacher*, 214 Kan 1, 519 P.2d 1116 (1974), which it found to be factually analogous. There, "[t]he only act respondent refrained from doing as a lawyer was making a formal appearance in court, *i.e.*, he stayed behind the rail; in all other

respects he continued to function just as he had before the suspension." 214 Kan. at 20. The panel specifically noted *Schumacher's* quotation from *State ex rel., v. Perkins,* 138 Kan 899, 908, 28 P.2d 765 (1934):

"One who confers with clients, advises them as to their legal rights, and then takes the business to an attorney and arranges with him to look after it in court is engaged in the practice of law." 214 Kan. at 9.

The panel found that, after Rost took retired status, he continued "to serve his clients in the same manner in the same location under the same name without interruption or discontinuity," with the only change being to have another attorney "front for him on most court appearances." The panel recited:

"62. After the Respondent registered as a retired attorney, he practiced law. The Respondent held himself out as an active attorney, sent correspondence to the Court indicating that he continued to be an active attorney, utilized his bar number, filed pleadings with the Court, met with clients, provided Mr. Lloyd with legal advice, and directly assisted Mr. Lloyd in resolving legal problems, all in violation of the Respondent's agreement with [the Disciplinary Administrator]. Because the Respondent continued to practice law after taking retired status, the Hearing Panel concludes that the Respondent violated KRPC 5.5(a)."

With respect to the remaining violations, the panel declared:

"63. 'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the Respondent engaged in 'conduct that is prejudicial to the administration of justice' when he practiced law when he was not authorized to do so. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

"64. Kan. Sup. Ct. R. 208(a) states, in pertinent part, that, '[o]nly attorneys registered as active may practice law in Kansas.' The Respondent engaged in the practice of law after he took retired status. Because the Respondent practiced law at a time when he was not registered as an active attorney, but rather as a retired attorney, the Hearing Panel concludes that the Respondent violated Kan. Sup. Ct. R. 208(a)."

## RESPONDENT'S ISSUES

In his brief to this court, Rost identifies seven issues, which we take the liberty of paraphrasing as follows: (1) The Kansas Supreme Court has no jurisdiction to enforce the Kansas Rules of Professional Conduct against an attorney who has registered as being retired; (2) the hearing panel's conclusions of law regarding the

areas of law in which a retired attorney could properly engage in nonlegal work improperly restricts a retired person's business opportunities; (3) the hearing panel improperly ignored Rost's written and oral notifications that he was no longer practicing law; (4) Rost's post-retirement activities did not constitute the practice of law; (5) the hearing panel failed to use the clear and convincing standard; (6) the hearing panel improperly applied the standards for imposing sanctions; and (7) the hearing panel recommendations for sanction were inappropriate.

## JURISDICTION

Rost concedes that "[a]ny attorney admitted to practice law in this state and any attorney specially admitted by a court of this state for a particular proceeding is subject to the jurisdiction of the Supreme Court and the authority hereinafter established by these Rules." Supreme Court Rule 201(a) (2008 Kan. Ct. R. Annot. 261). He does not deny that he was admitted to practice law in this state in 1966. However, he crafts an argument, based upon the provisions of Supreme Court Rules 208(a) and (f)(1) (2008 Kan. Ct. R. Annot. 307), that he ceased to be admitted to practice law when he registered as a retired attorney.

Specifically, Rost points to the provision in Rule 208(a) which permits an attorney to register as "active; inactive; retired; or disabled due to mental or physical disabilities," and the following requirement that "[o]nly attorneys registered as active may practice law in Kansas." 2008 Kan. Ct. R. Annot. 307. Likewise, Rost notes that Rule 208(f)(1) declares that "[a]n attorney who has registered as retired, . . . shall not be eligible to practice law in this state." 2008 Kan. Ct. R. Annot. 308. He then argues that because an attorney registered as retired is not permitted to practice law, such an attorney is not "admitted to practice law" within the meaning of the jurisdictional provisions of Rule 201(a).

We disagree with the suggestion that an attorney loses his or her hard-earned status as an admitted Kansas attorney simply by registering as anything other than "active." First, Rost ignores that our Rules Relating to Admission of Attorneys are set forth in Rules 701 through 710, inclusive (2008 Kan. Ct. R. Annot. 705-26). Most

applicants for admission are governed by Rule 704 (2008 Kan. Ct. R. Annot. 710), entitled Admission to the Bar Upon Written Examination. Those applicants must demonstrate that they are "of good moral character, possessed of the requisite general education, and otherwise qualified to be examined," prior to taking a written examination to demonstrate their knowledge of the law. Rule 704(c) (2008 Kan. Ct. R. Annot. 711). Then, if an applicant successfully passes the bar examination, the Supreme Court issues an order of admission, which becomes effective upon the taking of an oath.

Only after successfully clearing the hurdles to obtain admission to the Kansas bar, via Kansas Supreme Court order, is an attorney subject to Rule 208's requirement to annually register with the Clerk of the Appellate Court. Apparently, Rost overlooks the first sentence of Rule 208(a), which specifies that "[a]ll attorneys . . . *admitted to the practice of law* before the Supreme Court of the State of Kansas shall annually, . . . register with the Clerk of the Appellate Courts . . . ." (Emphasis added.) 2008 Kan. Ct. R. Annot. 307. Such language contemplates that there is a distinction between initially obtaining an order of admission from the Kansas Supreme Court and registering a status with the Clerk of the Appellate Court which provides a current eligibility to actively practice law.

Moreover, an attorney's unilateral action does not rescind the Supreme Court's order of admission. For instance, when an attorney voluntarily surrenders his or her license to practice law, the Supreme Court responds with an order of disbarment which directs that the attorney's name be stricken from the roll of attorneys admitted to practice in this state. See Supreme Court Rule 217 (2008 Kan. Ct. R. Annot. 343). Rule 208 does not require a Supreme Court order to permit an attorney to register on retired status with the Clerk of the Appellate Court and that act does not affect the order admitting the attorney to practice law in this state or effect a removal of the attorney's name from the roll of admitted attorneys. Just as telling, Rule 208(f)(1) does not require a retired attorney to comply with the provisions of Rules 701 *et seq.*, relating

to the admission of attorneys, in order to be reinstated to active status.

Accordingly, we hold that an attorney who has been admitted to practice law in the state of Kansas by order of the Supreme Court, but who has registered with the Clerk of the Appellate Courts as being on retired status, remains subject to the Kansas Rules of Professional Conduct and subject to the enforcement of those rules by the Supreme Court and its designees.

## RESTRICTING BUSINESS OPPORTUNITIES

Rost argued to the hearing panel that he was not practicing law because he was merely doing things that a person who is not an attorney might do. For instance, a nonlawyer real estate agent might prepare contracts or deeds, and, therefore, the argument is that a retired attorney is permitted to do the same things without being deemed to practice law.

The hearing panel answered that argument by opining that whether a retired attorney was practicing law when doing tasks that are also performed by nonlawyers depends on the retired attorney's area of practice prior to retirement. For example, a retired trial lawyer could become a real estate broker who completes simple contracts, negotiates deals, and fills out forms without practicing law. On the other hand, a real estate lawyer would be deemed to be practicing law if he or she became a real estate broker performing the same tasks. Rost contends that the panel's area-of-prior-practice rule represents an unconstitutional restriction on a retired attorney's pursuit of business opportunities.

First, we specifically reject the panel's proposed rule that the determination of whether a retired attorney is engaging in the unauthorized practice of law turns on the nature of the attorney's pre-retirement practice. Apparently, Rost's argument—that he was only doing what nonlawyers often do—enticed the panel to promulgate a rule which would provide some guidance on when an attorney can provide law-related services which are often provided by nonlawyers, e.g., real estate brokers, without being subject to the Rules of Professional Conduct. The panel's endeavor to establish a bright-line rule was unnecessary. An attorney's responsibili-

ties regarding law-related services are specifically defined in KRPC 5.7 (2008 Kan. Ct. R. Annot. 567).

KRPC 5.7(b) defines law-related services as those "that might reasonably be performed in conjunction with and in substance are related to the provision of legal services and that are not prohibited as unauthorized practice of law when provided by a nonlawyer." 2008 Kan. Ct. R. Annot. 567. The comments to the rule note that law-related services can involve "[a] broad range of economic and other interests of clients," examples of which include "providing title insurance, financial planning, accounting, trust services, real estate counseling, legislative lobbying, economic analysis, social work, psychological counseling, tax preparation, and patent, medical or environmental consulting." 2008 Kan. Ct. R. Annot. 569. Accordingly, the services which Rost contends that he was providing to his post-retirement clients, *e.g.*, accounting services and business advice, would appear to be enveloped within the definition of law-related services.

Nevertheless, a lawyer remains subject to the Rules of Professional Conduct even when providing law-related services, *i.e.*, those that are not prohibited as unauthorized practice of law when provided by nonlawyers, when the services are provided:

"(1) by the lawyer in circumstances that are not distinct from the lawyer's provision of legal services to clients; or

"(2) in other circumstances by an entity controlled by the lawyer individually or with others if the lawyer fails to take reasonable measures to assure that a person obtaining the law-related services knows that the services are not legal services and that the protections of the client-lawyer relationship do not exist." KRPC 5.7 (2008 Kan. Ct. R. Annot. 567).

The comments to the rule describe the potential for ethical problems when a lawyer or lawyer-controlled entity performs law-related services. The principal culprit is the possibility that the person for whom the law-related services are performed fails to understand that the services may not carry with them the protections normally afforded as part of the client-lawyer relationship. Accordingly, the burden is on the lawyer to show that reasonable measures have been taken to insure that the client understands that he or she may not expect the benefits of a lawyer-client relationship, such

as the protection of confidences, the prohibition against representing conflicting interests, or the maintenance of professional independence.

In this respect, the panel's focus on prior practice may be germane, if not determinative. If an attorney continues to perform the same law-related services, for the same clients, from the same location, with the same staff as was done when those services were not distinct from the attorney's provision of legal services, the burden to show the requisite client understanding that the lawyer-client relationship had ceased would appear to be onerous, at best. Nevertheless, the touchstone is not the nature of the prior practice.

Given that finding, we need not belabor Rost's tenuous and obtuse contention that the panel's area-of-practice rule violates some constitutional right to pursue business opportunities. We discern no such constitutional right. Rost's citation to *Granholm v. Heald,* 544 U.S. 460, 161 L. Ed. 2d 796, 125 S. Ct. 1885 (2005), which dealt with the Commerce Clause, is unavailing. Moreover, even where constitutional rights are implicated, the Supreme Court, by and through the hearing panel, may nevertheless enforce attorney disciplinary rules. See *In re Wilkinson,* 251 Kan. 546, 555, 834 P.2d 1356 (1992) (constitutional right of free speech subject to regulation in the area of attorney discipline).

## WRITTEN AND ORAL DISCLOSURES

Next, Rost argues that the hearing panel implicitly found, without any legal support, that Rost's written and oral disclosures to clients—that Rost was retired from practicing law—were insufficient, as a matter of law, to prevent potential clients from being confused. He points to the fact that he changed his sign to read "Rost & Rost Consulting, Inc." and his testimony that he told all of his clients that he was retired and not practicing law. Inexplicably, he then embarks on a discussion of what is required to establish a client's waiver of a conflict of interest.

We do not read the final hearing report as making any such matter-of-law finding. To the extent Rost asks us to reweigh the evidence, we decline the invitation.

Rost's better argument would have been to assert that changing the name on his sign and telling his clients he was retired from the practice of law were reasonable measures to assure that the clients knew that his law-related services were not legal services subject to the protections of the client-lawyer relationship. Under the circumstances, however, that argument would not have been persuasive. Given the lack of sophistication of his clients and the many other indicia that Rost was still performing legal services, more was required from him to meet his notification burden.

*DID RESPONDENT PRACTICE LAW?*

In his brief to this court, Rost asserts that the hearing panel based its determination that he was practicing law on five factors: Rost's correspondence with the district court; Rost's use of his Supreme Court registration number on documents filed with the district court; Rost's meeting with clients; Rost's specific meetings with Lloyd; and Rost's resolution of Lloyd's legal problems. He then makes a cursory attempt at refuting those factors.

With respect to the letter to Judge Yeoman on law firm letterhead, Rost asserts that the judge had testified that the Disciplinary Administrator had specifically advised the judge of Rost's retirement and that the letter was prepared by a temporary employee on stationery which was supposed to have been destroyed. Regardless of what the judge might have known, Rost signed a letter to the court, with a copy to another attorney, on stationery identifying Rost as an attorney at a time when he was not permitted to act as an attorney. He must bear responsibility for that act and cannot shift the blame to members of his staff. See Supreme Court Rule 5.3(c) (2008 Kan. Ct. R. Annot. 561) (lawyer is responsible for employed nonlawyer conduct that would be KRPC violation if done by lawyer).

With respect to using his Supreme Court registration number on documents filed with the district court, Rost first contends that he continued to possess his registration number, notwithstanding his retirement. He then argues that "[u]nder Supreme Court Rule 211 [*sic*] attorneys are required to use their 'Supreme court registration numbers for attorneys' on pleadings." Presumably, Rost

intended to refer to Supreme Court Rule 111 (2008 Kan. Ct. R. Annot. 196), which deals with the form of pleadings in the district court. That rule actually cuts against Rost. It provides that "[a]ll pleadings, briefs, and other papers prepared by attorneys or litigants for filing in the courts . . . shall include the name, Supreme Court registration numbers for attorneys, address, and telephone number of the person filing them." 2008 Kan. Ct. R. Annot. 196. Clearly, what distinguishes a pleading prepared and filed by an attorney from one that is prepared and filed by a litigant is the inclusion of a Supreme Court registration number. Accordingly, by including his registration number on the documents filed with the district court, Rost was identifying the pleadings as having been prepared and filed by an attorney. At the time, Rost was not authorized to prepare and file pleadings as an attorney.

With respect to meeting with clients, Rost simply refers us back to his argument that the hearing panel improperly restricted his business opportunities. We have rejected the argument that enforcing the prohibition against the unauthorized practice of law violates the Commerce Clause. To the extent that Rost suggests that he was permitted to meet with clients of a "consulting firm" which provided only law-related services, we find that potential argument is belied by Rost's own description of his activities, which will be discussed below.

With respect to the last two factors involving Lloyd, Rost simply argues that Lloyd did not testify that he received legal advice and that the only testimony that exists is Rost's statement that he advised Lloyd to obtain elsewhere the legal advice which Rost could not provide. This summary argument fails to address the fact that Rost investigated the ownership of the real property and the manner in which its purchase was financed; that Rost then determined and advised Lloyd that the discovered facts revealed a legal problem for Lloyd; that Rost recommended that Lloyd solve his legal problem by executing a quitclaim deed in favor of Mr. Fish; and that a quitclaim deed was prepared by Ms. McConnell, who was identified by Rost as his paralegal. Such a "consulting" endeavor required the application of legal knowledge and constituted the practice of law.

Perhaps the best evidence against Rost came from his own characterization of what he was doing after his "retirement." He told Hesse that he was a "paralegal." Some years ago, this court opined that a disbarred or suspended attorney could act as a paralegal. However, the activities of such a paralegal are limited.

"The consensus is that an attorney suspended from the practice of law may obtain employment as a law clerk, providing there are certain limitations upon the suspended attorney's activities. Regarding limitations, we are persuaded the better rule is that an attorney who has been disbarred or suspended from the practice of law is permitted to work as a law clerk, investigator, paralegal, or in any capacity as a lay person for a licensed attorney-employer if the suspended lawyer's functions are limited exclusively to work of a preparatory nature under the supervision of a licensed attorney-employer and does not involve client contact. Any contact with a client is prohibited. Although not an inclusive list, the following restrictions apply: a suspended or disbarred lawyer may not be present during conferences with clients, talk to clients either directly or on the telephone, sign correspondence to them, or contact them either directly or indirectly." *In re Wilkinson*, 251 Kan. at 553.

Rost's first problem is that he was not actually employed by a licensed attorney. Granted, he had an agreement with Kjorlie to sell his client base in which he agreed to provide "administrative assistance" to the buyer. However, the only compensation provision of that agreement involved splitting the future legal fees from Rost's "client base." In fact, Lloyd made his fee payments directly to Rost, rather than to Kjorlie.

Moreover, Kjorlie's testimony clearly refuted that he was acting as Rost's supervising attorney-employer in the matter. For instance, he appeared to be completely unaware of the particulars of the quitclaim deed preparation and was quite confused as to the nature of Lloyd's $3,500 payment to Rost. Rost's activities went far beyond "work of a preparatory nature." Rather, Rost was operating as an independent paralegal who even employed his own paralegal, McConnell.

Further, as Rost told Hesse, the client base of the post-retirement consulting firm was the same as the law firm's client base. Clearly, Rost made the majority, if not all, of the contacts with the clients. He even acknowledged that he would go to court with a former client and the new attorney to assist with the case. In short,

the only change in Rost's activities following retirement is that he would only "second chair" in court and that he would tell his clients he was a "retired attorney." Rost was practicing law.

Rost attempts to avoid the rules set forth in *Wilkinson* by asserting that a retired attorney is different from a suspended or disbarred attorney. He intimates that a retired attorney has more leeway to engage in some sort of limited practice of law than an attorney who has been suspended. We disagree. The reasons for applying the *Wilkinson* rule—*e.g.* to avoid the appearance of impropriety, to avoid confusion among laypersons, or to avoid the temptation for law-trained clerks (or paralegals) to go beyond mere preparatory work—apply as equally to retired attorneys as to suspended or disbarred attorneys. See *In re Wilkinson*, 251 Kan. 549-51.

Rost's situation is particularly akin to that of a suspended attorney because he avoided the potential of being placed on that status by agreeing to retire and cease practicing law. He was just as obligated to refrain from the practice of law as if he had been formally suspended.

## CLEAR AND CONVINCING STANDARD

Given the brevity of Rost's argument on this issue, we can recite it verbatim:

"The Hearing Panel admitted in paragraph 41 note 2 that it failed to use the clear and convincing standard as it related to the charge of preparing a legal document. In addition, Judge Yeoman testified that it was merely insinuation that he continued to practice law which of course is not sufficient to meet the clear and convincing standard."

The panel's footnote does not refute that it applied the correct standard to all of the evidence presented. To the contrary, it corroborates that the panel knew and applied the correct standard. We are convinced that the truth of the facts presented, many of which came directly from Rost, is highly probable.

Moreover, Judge Yeoman's function in this proceeding was to present the facts of which he had knowledge. The fact that this witness did not proffer a definitive legal opinion that Rost was continuing to practice law is of no consequence.

## STANDARDS FOR IMPOSING LAWYER SANCTIONS

Rost recites that he is challenging whether the standards for imposing lawyer sanctions were violated. For argument, however, he simply argues the facts, in effect urging us to reweigh the evidence and reassess witness credibility. We need not rehash the facts. Moreover, we find that the hearing panel correctly applied the applicable standards.

## APPROPRIATENESS OF HEARING PANEL RECOMMENDATION

The hearing panel noted that this case is unique, and it crafted a recommended sanction which it felt would rectify the misconduct and prevent future misconduct. It recommended that Rost be disciplined by published censure, and in conjunction with the censure that the Supreme Court issue a cease and desist order. Then, if Rost subsequently violates that order, the court can cite him for contempt. In making its recommendation, the panel recited:

"65. In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"66. *Duty Violated.* The Respondent violated his duty to the profession to comply with rules and orders of the court.

"67. *Mental State.* The Respondent knowingly violated his duty.

"68. *Injury.* As a result of the Respondent's misconduct, the Respondent caused potential harm to Mr. Lloyd and the legal profession.

"69. *Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"70. Prior Disciplinary Offenses. In 2001 and 2003, the Respondent was previously disciplined by informal admonition in a total of three cases. In DA8437, the Disciplinary Administrator informally admonished the Respondent for having violated KRPC 1.3 and KRPC 8.4. In DA8440, the Disciplinary Administrator informally admonished the Respondent for having violated KRPC 1.5. In DA8946, the Disciplinary Administrator informally admonished the Respondent for having violated KRPC 8.4.

"71. <u>Dishonest or Selfish Motive</u>. The Respondent's misconduct—practicing law after he was retired from the practice of law—was motivated by selfishness.

"72. <u>A Pattern of Misconduct</u>. The Respondent engaged in a pattern of misconduct by continuing to practice law after he had taken retired status.

"73. <u>Refusal to Acknowledge the Wrongful Nature of Conduct</u>. The Respondent refused to admit any wrongdoing.

"74. <u>Vulnerability of Victim</u>. Mr. Lloyd is an ill and feeble elderly man. He was vulnerable to the Respondent's misconduct.

"75. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"76. <u>Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney</u>. The Respondent was an active and productive member of the bar in Topeka, Kansas. He enjoyed the respect of his peers and clients and generally possesses a good character and reputation.

"77. In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system.' Standard 7.2.

'Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system.' Standard 7.3.

'Reprimand is generally appropriate when a lawyer: . . . (b) has received an admonition for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.' Standard 8.3."

In contrast, the Disciplinary Administrator recommends that Rost be disbarred, citing to two additional standards:

"Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system." Standard 7.1.

"Disbarment is generally appropriate when a lawyer:
(a) intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession." Standard 8.1(a).

The Disciplinary Administrator supports the recommendation for a harsher sanction by arguing that Rost blatantly violated his

agreement with the Disciplinary Administrator's office to retire from the practice of law; that he has failed to acknowledge any wrongdoing; and that he took advantage of Lloyd, who the panel described as an "ill and feeble elderly man."

Rost challenges the panel's recommendation, believing that no sanction is warranted. He argues that we have no jurisdiction over retired attorneys; that his unintentional letter to the district court and use of his attorney registration number do not warrant public censure; and that his actions with regard to Lloyd did not establish, by clear and convincing evidence, that he was practicing law.

This court carefully considers the sanction recommendations of assigned hearing panels, as well as giving due regard to those of the Disciplinary Administrator. However, we are not constrained by those recommendations and may fashion a sanction that is entirely of our own choosing. Supreme Court Rule 212(f) (2008 Kan. Ct. R. Annot. 328-29) (sanction recommendations are "advisory only and shall not prevent the Court from imposing sanctions greater or lesser than those recommended").

We discern that the hearing panel was striving to develop a sanction recommendation which would provide for some oversight to insure that Rost does not continue to practice law. However, we agree with the Disciplinary Administrator's assessment that a more severe sanction is warranted. When previously faced with disciplinary proceedings, Rost essentially agreed to an indefinite suspension from the practice of law, styled as a retirement. He was unwilling to abide by that agreement and gives no indication that he understands that being on retired status does not permit him to independently practice law, even on a limited basis. Imposing a sanction of disbarment will clarify Rost's status, both for him and for his clients. See Supreme Court Rule 218 (2008 Kan. Ct. R. Annot. 350) (disbarred attorney must notify clients in writing of inability to provide further legal representation).

Based upon our consideration of the entire record, the arguments of counsel, and statements of the respondent, we conclude that the appropriate discipline in this case is disbarment from the practice of law in this state.

It Is Therefore Ordered that the respondent, Thomas O. Rost, be and he is hereby disbarred from the practice of law in the state of Kansas in accordance with Supreme Court Rule 203(a)(1) (2008 Kan. Ct. R. Annot. 266) for his violations of the Kansas Rules of Professional Conduct.

It Is Further Ordered that the Clerk of the Appellate Courts strike the name of Thomas O. Rost from the roll of attorneys licensed to practice law in Kansas.

It Is Further Ordered that the respondent shall forthwith comply with the provisions of Supreme Court Rule 218 (2008 Kan. Ct. R. Annot. 350) and shall furnish proof of compliance to the Disciplinary Administrator.

It Is Further Ordered that this opinion be published in the official Kansas Reports and that the respondent pay the costs of these proceedings.

Luckert, and Rosen, JJ., not participating.

Elliott, and Caplinger, JJ., assigned.